Filed 6/2/25  P. v. Bean CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B334652 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA449606) |
| v. | |
| DAVID BEAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge. Affirmed.

Law Offices of Halpern & Halpern and Henry Russel Halpern, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.

*   *   *

## I.   INTRODUCTION

Defendant and appellant David Bean and his co-defendant Jenelle Williams were each charged with four murders occurring at different locations within a time span of two weeks in the summer of 2016. The same gun was used in all four murders. Other crimes and enhancements related to the same incidents, as well as priors, were also alleged.

Bean and Williams were tried together by the same jury in 2023. Bean was convicted of first degree malice murder, first degree felony murder, and second degree malice murder, with various enhancements and special circumstances found true. He was acquitted of the remaining murder charge. He was also convicted of three counts of being a felon in possession of a firearm and one count of assault with a firearm.[1] Bean was sentenced to three consecutive terms of life without parole for the murders, plus 25 years to life for assault with a firearm, plus an aggregate firearm enhancement of 51 years and four months to life, plus an aggregate determinate term of six years and eight months.

On appeal, Bean challenges only the sufficiency of the evidence to sustain the three murder convictions, attempting to do so without confronting either the deferential standard of review applicable to such claims or the substantial record evidence supporting the convictions. We reject his challenge to each murder conviction.

---

[1]     Williams also appealed from the judgment but she is not a party to this appeal. Her appeal is pending before us in case number B329593.

We strike what is an unauthorized sentence of 10 years, imposed but stayed, for two prior convictions under what appears to have been the authority of Penal Code section 667, subdivision (a)(1), and otherwise affirm the judgment.[2]

## II. BACKGROUND

A. *Factual Background*[3]

1. <u>Bean and Williams—General Background</u>

Bean was a documented Eight-Trey gang member. He had prior convictions for grand theft in 2001 and robbery in 2008, which he admitted. His co-defendant Williams, aka "Gigi," was at least an associate of the rival gang known as the Rollin' 60's, having grown up in that gang's territory. According to her testimony, she had never been "jumped in" to the Rollin' 60's gang and was not a member. Williams admitted to having a prior conviction for assault with a deadly weapon. She also admitted to being a drug addict.

Bean and Williams went to elementary school together and Williams testified she knew Bean "from the streets." By July 2016, according to Williams, they had "possibly" or "probably" become romantically involved and she knew he was an "Eight-Trey Gangster." According to Bean, in July 2016, he and Williams had an exclusive romantic relationship, and at the time of trial in 2023, he still loved her.

---

[2]    Further unspecified statutory references are to the Penal Code.

[3]    We take the facts from the trial evidence and set them out in some detail, as we must, and in the light most favorable to the judgment given the standard of review for insufficiency claims, discussed below. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.)

3

According to law enforcement, the Eight-Trey and Rollin' 60's gang rivalry had existed for a long time and was ongoing. Although dating across gang lines was not common, it did occur. According to Bean, the Rollin' 60's gang had "[put] a hit" out on him because he was dating Williams, who was at least, he acknowledged, an associate of the Rollin' 60's gang and he was therefore not supposed to be dating her.

2.     July 29, 2016 Murder of Marcus Wilkerson (Ct.1)[4]

On July 29, 2016, at just before 5:00 a.m., residents of the area of Gage and Western Avenues in Los Angeles heard voices and a gunshot outside and called 911. One witness heard a man's voice say something to the effect of, "Is this how it's going to be?" or "I can't believe you're doing this to me" or "Is it going to end this way?" followed by a gun shot. Approximately an hour later, a pedestrian discovered Wilkerson's body behind a parked car and called 911. When police arrived, they located the body, and a spent .45 caliber bullet casing, branded Federal. Paramedics arrived and determined that Wilkerson was dead. An autopsy later determined he had a visible gunshot wound to his right upper thigh near his groin, which had resulted in extensive blood loss and ultimately his death by homicide.

Law enforcement investigation revealed that Williams had previously been in a romantic relationship with Wilkerson and she was angry with him for having been with another woman, L.S., whom Williams had previously threatened. According to

---

[4]     Although Bean was acquitted of this murder, the facts are relevant for context and a full understanding of the relationship between Bean and Williams in connection with the other three murders of which he was convicted.

4

L.S., she knew Williams as "Gigi," a self-admitted member of the Rollin' 60's gang, and the two had been friendly at one time. L.S. said that Williams had once said to her, " You f'ing with my man" and "Bitch, I'll kill both y'all," along with "If I can't have him, no one can." According to L.S., Wilkerson had told her that he feared Williams and had said to L.S. that Williams would "be the death of" him.

Williams had also threatened a woman who had had frequent interactions with Wilkerson while the woman was at work at the Jack-in-the-Box near where he was killed. The woman gave him free food and paid him to wash her car until one time when he drove the car away without her permission and she reported it stolen. Williams threatened the woman by telephone—from a number later connected to Williams—over dropping the charges and about repaying Williams for Wilkerson's bail she had posted. The woman provided police with video footage taken from the parking lot of the Jack-in-the-Box about two weeks after Wilkerson's murder. It showed Williams getting out of a black Chevrolet Malibu registered to Bean. This was law enforcement's first connection between Williams, the car, and Bean. Bean and Williams were seen together in that car at other locations in this period.

Williams acknowledged in her testimony being "close friends" with Wilkerson but denied having been romantically connected with him or having any involvement in his death. She said she had lied when she previously told law enforcement that Wilkerson was her boyfriend and had done so because she was high on drugs. She had bailed Wilkerson out of jail because they were friends but had done the same for many people. Williams said that at 4:45 a.m., some 15 minutes before Wilkerson was

killed, she was driving around in Bean's car, which she said she had borrowed after he spent the night with another woman. According to Williams, she was looking for Wilkerson because he had a court appearance that day and had not signed his bail paperwork. She could not find him but, according to her, this explained why her cell phone pinged off cell-phone towers near the Wilkerson murder location.

Williams acknowledged knowing the other woman involved with Wilkerson, L.S., "from the streets" but denied any reason to be jealous of L.S.'s relationship with him. Williams testified that L.S. had told her of Wilkerson's death and Williams denied ever having threatened L.S., contrary to L.S.'s testimony. L.S. also testified that after she spoke with law enforcement at the scene about Wilkerson's murder, Williams threatened her for cooperating with police, this time while possessing a gun. According to L.S., Williams told people near her to move out of the way and L.S. believed Williams was going to kill her. Bean was then with Williams and he also threatened L.S. for her cooperation with law enforcement in investigating Wilkerson's death, saying to her, "[H]ear me good. Get my fucking name out your fucking mouth." Bean testified that Williams had never mentioned to him having seen Wilkerson with another woman or being angry with him. Williams denied ever having threatened L.S. over anything.

The day after Wilkerson's death, Williams called his sister from phone number 323-453-7617 to offer condolences. Williams acknowledged using this phone number and cell phone records tied to this number placed her at the murder scene when Wilkerson was determined to have been shot. Wilkerson's sister said she frequently spoke with him over the phone and that his

girlfriend, "Gigi," was often on the line interrupting the call. Gigi was a jealous person, according to the sister, and often complained to her about Wilkerson's sexual involvement with other women.

A bullet fragment taken from Wilkerson's body was determined to be too small and damaged to be forensically connected to a particular gun. But the casing found at the scene was later connected to the gun used in all four murders. Williams testified she had bought the gun used to kill Wilkerson a few days after his murder, on August 1st or 2nd. But when confronted with Bean's testimony that he had bought the gun on August 3, 2016, and that it was his, Williams testified that they had bought the gun together. She said a man had walked up to Bean's car where they were sitting and offered to sell them the gun, and she paid for it with her money.

Bean testified that he knew Wilkerson as they had "smoke[d]" together and that there was no animosity between them. He denied killing Wilkerson, having been present when Wilkerson was shot, having helped anyone get away after the killing, or knowing who killed him. Bean said he knew L.S. enough to say hello and acknowledged having asked her why she had his name "in [her] mouth" about Wilkerson's death when he had nothing to do with that. Bean said he did not recall specifically threatening L.S., but if he did, he did not recall Williams being with him at the time.

Bean told a detective investigating the Wilkerson murder that he had been by himself at a 24-hour "smoke shop" that night in the same area where Wilkerson was killed. But, to his surprise, he saw Williams immediately after when he left the smoke shop and drove to a nearby clinic. Bean then drove

Williams to her motel room where she was living. He said he left her room after about 10 minutes and had sex with another woman at the same motel. He saw Williams the next morning at around 10:00 a.m. and did not know her whereabouts in the interim.

Cell phone data showed that the phone number associated with Williams was near the Wilkerson murder scene both before the killing and for about a half an hour after.

3.      August 9, 2016 Murder of Shawn Pryor (Ct.4)

On August 9, 2016, Shawn Pryor and his wife, Sandra Pryor, were staying in a motel in Inglewood. Surveillance video from the motel captured Bean, Williams, and a female identified as Tiffany Doxy entering the motel at approximately 2:39 a.m. and proceeding towards the room on the second floor where the Pryors were staying. Williams and Doxy went to the door and knocked, while Bean held back down the hallway. The Pryors heard the knock. When Shawn Pryor asked who it was, a voice responded that it was "Tiffany." Sandra Pryor went into the bathroom to dress while Shawn Pryor opened the door. Doxy was at the door, standing with another woman, identified as Williams. Surveillance video showed Doxy and Williams at the room at around 2:40 a.m. Bean was still holding back down the hall, beyond view from inside the room.

Once Shawn Pryor opened the door, Doxy went inside and asked him for some money and then Doxy left the room. Surveillance video showed her briefly speak to Bean on her way out. He was outside the door at that point. Sandra Pryor came out of the bathroom just as Doxy was leaving. Williams came into the room, ostensibly to buy drugs from Shawn Pryor but using counterfeit bills, which he discovered after giving her change for

the purchase. Surveillance video from outside the room showed Bean arriving at the room doorstep and stepping into the doorway while Williams was inside. According to Sandra Pryor, Bean stood in the open doorway with a gun and said to Shawn Pryor something to the effect of, "You know what this is. Give me your money. I want everything." When this happened, Pryor threw money he had in his hands on the floor. And he told Sandra Pryor to shut the door. Williams, from inside, "pushed" Sandra Pryor into the wall at the corner of the room behind the door and said, "Don't try it. Don't move. Don't say nothing." Sandra Pryor also heard Williams say at one point, "Tiffany set this up. It was Tiffany," meaning Doxy.

The Pryors together worked to close the door to keep Bean out of the room but Bean fired his gun into the room through the door. Sandra Pryor saw Bean through the crack in the door and then heard gunshots while trying to close the door. Surveillance video from outside the room showed Bean with something in his hand at the door and two bursts of dust or debris bursting into the camera view, as if disturbed from the force of a gun firing.

Shawn Pryor was able to close the door keeping Bean outside the room. He and Williams then engaged in a struggle inside the room and on the bed, during which the camouflage-colored jacket Williams was wearing came off. Sandra Pryor had picked up some of the money her husband had thrown to the ground and put it in her purse. She went to the separate kitchen area of the room to call 911. She heard glass breaking followed by more gun shots while she was on the 911 call. After the shots, Sandra Pryor saw her husband fall to the floor from the bed, bleeding. Surveillance video showed Bean breaking the room's window from the outside with a gun and pointing the gun inside

the room. Sandra Pryor tried to come to the aid of her husband but he was bleeding so profusely that she could not see the gunshot wounds.

Williams left the room but left her jacket inside, which was later turned over to police. Surveillance video showed her leaving the room and then Williams and Bean running slowly and leaving the motel together, at about 2:49 a.m. The video showed Williams was not then wearing the jacket she was wearing when she entered the room. Williams acknowledged in her testimony that it was she, Doxy, and Bean in the surveillance video.

At approximately 3:00 a.m., law enforcement responded to the motel shooting. They found Shawn Pryor face down in his room with multiple gunshot wounds and not moving, with Sandra Pryor still present in the room, very upset. Paramedics arrived and assessed Shawn Pryor's condition before taking him away in an ambulance. Law enforcement took photographs of Pryor before he was removed from the room, noting money bills around him and blood in the room and on some of the bills, indicating a physical struggle, according to law enforcement. An autopsy later determined that Shawn Pryor had suffered fatal gunshot wounds to his chest and abdomen. A deformed bullet was lodged in his sacral bone. The shots had been fired from an indeterminate range. The manner of death was homicide.

Investigation revealed a bullet hole in the motel room door and the shattered side window. There were three expended Federal brand .45 caliber bullet casings inside the room—two near the door and one at the bed. A forensics specialist collected the bullet casings and Williams's jacket, which had a narcotics pipe and a lighter in the pocket. There were also some counterfeit bills inside the jacket as well as in Sandra Pryor's purse. All the

counterfeit bills had the same writing on them: "For Motion Picture Use Only." Sandra Pryor had never seen her husband with counterfeit bills before and she did not notice any in the room before Bean and Williams arrived. DNA from the pipe in Williams's jacket was later matched to her and DNA from the motel window sill around the shattered window was matched to Bean.

The three casings and two bullets discovered in the motel room were later determined to be from the same gun used in Wilkerson's killing. The bullet fragment taken from Shawn Pryor's body could not be either positively matched or excluded from use by the same gun.

According to Williams's testimony, she, Bean, and Doxy went to the motel to buy cocaine from Shawn Pryor. She had never met Doxy before and didn't know Bean had a gun on him or that a gun would be used. After Doxy left the motel room, Williams asked Pryor for $30 worth of cocaine and gave him one of three counterfeit $50 bills she was carrying. Pryor gave her the cocaine and $20 in change. Pryor noticed the $50 bill did not look right and he confronted Williams as she was leaving the room. She denied the bill was counterfeit and he yanked her back into the room, telling his wife to "go get the thing" because "this bitch is trying to play me." Williams screamed and Bean then appeared at the motel room door, stepped into the room, and asked what was happening. Williams responded that Pryor was upset about the money. Williams denied pushing Sandra Pryor behind the door. According to Williams, Pryor grabbed her arm and pulled her back and they started fighting while someone closed the door on Bean. Williams left the room after Bean fired the gun through the window. Williams said she had no intention of robbing Pryor

or committing a burglary when she entered the room and that she only wanted to buy drugs from him using the counterfeit money.

In his testimony, Bean admitted shooting Shawn Pryor but claimed he acted in defense of Williams. He said he, Williams, and Doxy had gone to the motel to buy cocaine from someone Doxy knew. When they arrived, Doxy told him to hang back while she approached the dealer. Doxy and Williams went to the door of the motel room. After he felt too much time had passed, Bean went to the room and saw Shawn Pryor trying to prevent Williams from leaving. Bean said he heard Pryor say to Williams, "You ain't fittin' to leave. Here you trying to play games," referring to the counterfeit money. Pryor grabbed the change back out of Williams's hand and pulled her back into the room. According to Bean, Pryor fired a shot at him while struggling with Williams and before slamming the door on Bean. Bean always kept a gun on him for protection and he used it to fire a shot back at Pryor through the door. Bean then broke the motel-room window and fired two more shots into the room. Bean said he fired the shots to "d[if]fuse the situation," intending to allow Williams the opportunity to leave the room and escape. Williams ran out of the room and they fled the motel.

According to Bean, they went to the home of his friend, Jeffrey Burton, known as "Doughboy," and Bean took a shower because of his bleeding hand that had been cut when he broke the motel-room window. Doxy drove herself somewhere else. Bean left his gun in his car parked at Burton's house and his car keys on a table inside the residence. Bean could not explain how the gun used in the shooting of Shawn Pryor was also used to kill

Doxy some 15 minutes later and he did not know what happened to his gun after he got to Burton's house.

Surveillance video from the motel showed no physical contact or struggle between Shawn Pryor and Williams before Bean appeared at the door and stepped inside, appearing to fire the first shot into the motel room. According to Sandra Pryor, her husband did not have a gun in the room and no forensic evidence supported that Pryor either had or fired a gun.

4.  August 9, 2016 Murder of Tiffany Doxy (Ct.8)

As shown on surveillance video, approximately 12 minutes after leaving the motel where Pryor was shot, Williams, Bean, and Doxy arrived about two miles away at a parking lot near a liquor store, Doxy having driven her own Volvo with Williams as a passenger behind what resembles Bean's Chevy Malibu. That car did not enter the parking lot but turned and waited on the street nearby. Doxy stopped the Volvo after backing it into an angled parking space but left the car running. Williams then shot her in the face. Video footage from the nearby liquor store showed a flash of light inside the Volvo consistent with the muzzle flash of a gun being discharged. Williams got out of the passenger side of the Volvo, wearing clothing that matched Sandra Pryor's description of what she had been wearing in the motel room, and went to the nearby car resembling Bean's, which had flashed its headlights, and they drove away. Immediately after the shot, Doxy's car in reverse struck a wall in the parking lot at a diagonal angle and the car was left running. There was a .45 caliber spent bullet casing later discovered on the front passenger seat.

Law enforcement realized Pryor's and Doxy's murders were connected because Doxy had been at the motel location where

Pryor had been shot, the two murders occurred close in time and location, and Doxy was wearing the same clothes in both locations, as seen on video from the motel. An autopsy later revealed that Doxy had stippling on her face, indicating that the gun had been discharged from one to three feet away, consistent with the surveillance video showing the flash of light from inside the car. The bullet to her face was lodged in her neck and she died from the gunshot wound in the manner of homicide. Sandra Pryor identified Doxy from a photograph as the victim of the gunshot and as the person who had earlier come into the Pryors' motel room.

Williams denied any involvement in or presence at Doxy's murder and suggested that a third party may have committed the crime. Williams said that after she and Bean left the motel where Pryor had been shot, they immediately drove in Bean's car to his friend Burton's house, and it took about 10 minutes to get there. When they got there, Doxy was outside the house in her own car and she did not come into the house. At Burton's request, Williams gave him the keys to Bean's car, where the gun was in the center console. Williams then got into the shower with Bean, so she did not actually see Burton or Doxy leave the house. After Williams got out of the shower at Burton's house, he returned but Doxy did not.

Williams acknowledged that the surveillance video showed Doxy's Volvo drive into a parking lot near Burton's residence after they left the motel where Pryor was killed. She said that neither she nor Bean were in the car with Doxy. She denied that the person who got out of the Volvo after the muzzle flash was her and further denied having killed Doxy or ever having been in that car.

According to Bean's trial testimony, after he and Williams left the motel where Pryor had been shot, they went directly to his friend Burton's house, where he took a shower because his hand was bleeding. Williams never told him she had shot Doxy. He put the gun in his car console after they left the motel, and he left it there. He could not explain how the same gun was used to kill Doxy.

5.    August 13, 2016 Murder of Kenyada Thornton (Ct.9)

On August 13, 2016, at around 10:40 a.m., Jose N., who lived near 11th Avenue and West 63rd Street in the City of Los Angeles, was at home drinking with friends. He saw a black Chevy Malibu approach his house and double park in the street in front, next to his own car. Williams got out of the driver's side of the Malibu and asked Jose N. if he wanted to buy a cell phone. Bean remained seated in the passenger side of the parked Malibu, reclining.

Jose N. repaired cars for Kenyada Thornton. As he was speaking with Williams about the cell phone, Jose N. saw Thornton walking up 63rd Street towards them with two black objects in his hands. When Thornton approached, he asked Williams who was in her car, referring to Bean. She responded, "Don't worry about it. It's nobody." After observing this, Jose N. turned around to go inside his house to speak with his mother about buying the phone. But he saw Thornton tap on the Malibu's front window on the passenger side with one of the objects in his hands, likely the gun ("probably a nine" millimeter), and then Thornton pointed the object in his hand downward toward the ground. Thornton said to the man in the car, "What are you doing around here?" and "You better get out of here, motherfucker." While inside his house but through a front

window, Jose N. could see Thornton then put both his hands in front of his body while holding the objects in them, palms down. Thornton turned around to walk away with his back to the car before any shots were fired.

Jose N. then heard lots of gunshots, one kind distinctly louder than the other with the louder ones coming first. According to ballistics evidence, .45 caliber bullets are louder when shot than nine-millimeter bullets shot from a less powerful gun. Williams, who was still outside Jose N.'s house but interacting with Jose N. from inside about the phone, said to him, "I've gotta go." She got back into the black Malibu and drove away with Bean in the car. Jose N. remained inside his house for about five minutes and someone called paramedics to assist Thornton, who had been hit and had collapsed. When Jose N. went outside, he saw Thornton lying on the sidewalk. There was a phone and a gun near Thornton's hand but someone in the gathered crowd removed those items before law enforcement arrived on scene. Law enforcement did not locate a firearm near Thornton's body when securing the scene. Jose N. later noticed that his car parked in front of his house had been hit with bullets.

Thornton was not breathing when paramedics responded to the scene and transported him to a local hospital. An autopsy revealed he had sustained a fatal gunshot wound to the chest and the manner of death was homicide.

Crime scene investigators arrived about a half hour after the shooting. They found eight .45 caliber casings and five or six fired .45 caliber bullets and bullet fragments. They also found multiple nine-millimeter bullet casings. The two different kinds of casings were generally located in two distinct areas. Car

windows nearby had been shattered from bullet impacts. Two bullets were recovered from Jose N.'s car and a bullet casing was found in some grass nearby. The .45 caliber casings recovered from the Thornton crime scene were later found to match those from the Wilkerson and Pryor murders.

According to Williams, she drove Bean in his car to Jose N.'s house. She knew Jose N. as "Victor." While she and Victor spoke about the phone, Thornton, who was her friend and a Rollin' 60's gang member, approached her and asked, "What's up, Gigi?" He then asked her who was sitting in the Malibu, referring to Bean, and she responded not to worry, "It's nobody." She was attempting to diffuse any tension or conflict from her having brought an Eight-Trey gang member into Rollin' 60's territory. But at some point, Williams saw Thornton at the car asking Bean something like "Where are you from" and "Why are you over here." She did not hear Bean's response but she walked over to Thornton and said, "Can you just leave us alone?" and "He's not over here for that." Williams turned back to trying to sell Victor the phone and then heard gunshots. She ducked behind a tree and saw Thornton shooting at the Malibu. She got into the car and she and Bean drove away.

According to Bean's testimony, Thornton, whose body was later found to have a Rollin' 60's tattoo, approached Bean's car while it was double parked in front of Jose N.'s house. Bean had accompanied Williams to the location inside Rollin' 60's gang territory where she was trying to sell a phone. Bean knew that Rollin' 60's had a hit out on him for being an Eight-Trey member and dating Williams. He was reclining in the passenger seat of his parked car, trying to lay low. Thornton threw a gang sign, meaning he made a hand gesture to indicate his Rollin' 60's

gang's claim of the neighborhood as its territory. Thornton then approached Williams and asked who was in the car. She told Thornton not to worry who was in the car and that they were just trying to "take care of [her] business." Then Thornton walked toward the car with his gun out, banged on the car with it, and said, "What you doing over here? You know where you at." After starting to walk away, Thornton turned around and began shooting at Bean through the car window while Bean was trying to get out or duck. Bean fired back at Thornton in self-defense. Thornton then ran away without Bean knowing whether he had shot him.

6. <u>The August 15, 2016 Arrest of Williams and Bean and Retrieval of the Gun</u>

On August 11, 2016, law enforcement obtained identification information on the black Chevy Malibu found to be related to the crimes. The license plate could be seen on surveillance videos, from which it was determined that Bean was the registered owner. On August 15, 2016, Detective Garza alerted patrol officers to be on the lookout for the Malibu. That day, Detective Garza saw and followed the Malibu, in which Bean and Williams were riding, traveling on 80th Street. At around noon, Sergeant Ramirez, while on patrol, saw the car stop near a cannabis dispensary on Florence Avenue.

The dispensary was located next to a tobacco shop. Sergeant Ramirez parked his car up the street—a vantage point from where he could watch the vehicle after calling for backup. While watching, the sergeant saw Bean get out from the driver's side of the Malibu and Williams get out from the passenger side and they both entered the tobacco shop. They seemed to be aware of the sergeant's presence. While Bean stood in front of the

18

dispensary, Williams went back to the Malibu and retrieved a large purse from the passenger side, and then she went inside the dispensary. Sergeant Ramirez lost sight of Williams and Bean for up to half a minute but then he saw them leave the dispensary together and walk towards his location. They then began to walk in different directions. Sergeant Ramirez drew his weapon and stopped Bean, waiting for assistance while Bean lay on the ground. After Bean was handcuffed, Ramirez saw Williams standing across the street. She too was arrested and taken into custody without incident. DNA samples were taken from both Bean and Williams.

Detective Bellows arrived after Williams and Bean had been taken into custody. Sergeant Ramirez informed him that Bean and Williams had entered the dispensary before walking up the street. Bellows went inside the dispensary and obtained consent to search the premises from the owner. He found on the underside of a couch a semiautomatic firearm with a .45 caliber bullet in the chamber and more bullets in the magazine. The gun, bullets, and magazine were swabbed for DNA and booked into evidence.

Detective Garza located Bean's car, still running, outside the dispensary. It was impounded and taken to a tow yard. Bean's driver's license was found in a wallet recovered from inside the car. The license had the same address as the vehicle registration. A cell phone and some other items, including a citation from August 9, 2016, during the crime spree, were also found inside the car.

Surveillance video from the dispensary and tobacco shop from August 15, 2016, at 11:31 a.m., showed Bean parking his car outside the dispensary in the same place where it was later

seized by police. The footage also depicted Williams and Bean getting out of the car in the same clothing each was wearing when arrested. It further showed Williams retrieving the large purse from the car and then going into the dispensary, and Bean standing outside with his back turned to the camera. Video from inside showed Williams secreting something in the dispensary couch.

      7.     Bean's Post-Arrest Statements to Police

The day after his arrest, Bean was interviewed by police detectives. He was advised of his *Miranda* rights and impliedly waived them by answering questions.[5] He admitted membership in the Eight-Trey gang but said he didn't "bang" anymore because of his age of 36. He said there was "no denying" that the Eight-Trey and Rollin' 60's gangs were enemies and that he was in Rollin' 60's territory during the Thornton shooting. He denied that he and Williams were in a sexual relationship. He denied having shot at Thornton first and claimed he was at a smoke shop around the corner from the crime scene when Wilkerson was killed and only ran into Williams unexpectedly after that.

      8.     Bean's Jail Calls

Bean made a few recorded jail phone calls between the day of his arrest on August 15, 2016, and August 18, 2016. Law enforcement obtained the recordings, which were played for the jury, with transcripts provided. On August 15, 2016, the day of his arrest, Bean called his friend Jeffrey Burton, known as "Doughboy," and in coded language suggested that Burton check "up under your couch" at the "smoke shop" on Florence Avenue

---

5     *Miranda v. Arizona* (1966) 384 U.S. 436. Bean does not claim any *Miranda* violation.

20

for his items, referring to the gun Williams had left in the couch at the dispensary.

Bean made a second call on August 15, 2016, to a woman named Antoinette. In that call, he explained that the Rollin' 60's gang had put "a hit out on" him and were coming after him, "hunting for [him] every day," so he had "brought it to them" in their own territory, seemingly referring to his presence in Rollin' 60's territory when Thornton was killed. In his trial testimony, Bean denied that he had intentionally gone to Rollin' 60's territory to kill someone and was only defending himself against Thornton.

Bean made a second call to Doughboy on August 16, 2016. In that call, again in coded language, Bean followed up on whether Doughboy had retrieved his "laundry" from under the couch by "lift[ing] the whole thing up." Doughboy responded that Bean's "laundry [was] not there" and that when Doughboy had inquired, the "manager" had said "the worst." This led Bean to ask, if the "worst" had occurred, implying that if the gun Williams had hidden under the couch at the dispensary had been found by law enforcement, why was he not then being charged with more than what he understood to be a probation violation. Bean later admitted in trial testimony that in the call, he was asking Doughboy to find and get rid of the gun hidden in the dispensary couch. He knew the gun had been used to shoot people, so he did not want it to be found. He and Williams did not discuss hiding the gun and he said he didn't know she had put it in or underneath the couch until after they left the dispensary.

On August 18, 2016, Bean called his mother. In that call, he relayed that the gun connected to "all that shit"—the murderous crime spree—had been found by law enforcement but

21

he denied it was his gun. He blamed everything on "that bitch" or "that girl" and tried to distance himself. At trial, Bean testified that he was not referring to Williams in the call to his mother and that if he had ever said that Williams had used or owned the gun, he was lying and that he never let anyone use his gun.

9.    Ballistics Evidence Summary

The bullet casing found at the Wilkerson crime scene, the three casings and two bullets recovered at the Pryor crime scene, the bullet casing found on the passenger seat of Doxy's car, and the .45 caliber bullet casings from the Thornton crime scene and the bullet recovered from Thornton's body were all fired from the same gun retrieved from the cannabis dispensary near where Bean and Williams were arrested. The bullet recovered from Pryor's body and the bullet fragment recovered from Doxy's body were both of .45 caliber but neither could be positively matched to or excluded from that same gun. The bullet fragment recovered from Wilkerson's body was too small and damaged to be compared to the gun.

10.    Gang Expert Evidence

Although there were no gang charges or allegations, the prosecution presented opinion evidence from a gang expert. He testified that the Rollin' 60's and Eight-Trey gangs have been mortal rivals involved in an ongoing feud for many years. The rivalry had produced murders, shootings, vandalism, and graffiti. It was still ongoing in the summer of 2016.

The expert identified Bean from his tattoos as an Eight-Trey gang member with the moniker of "Tiny Diamond." A gang "associate," as Williams had been identified, is not a full-fledged member of a gang who has gone through some form of initiation, known as being "jumped in." A gang associate can be a friend or

relative of a gang member, someone who grew up in the neighborhood, or just someone the gang members know.

The neighborhood where Thornton was killed is a "hot spot" for the Rollin' 60's gang. If an Eight-Trey gang member entered that territory in July or August of 2016, there would have been a "very high likelihood" of a response. Rollin' 60's gang members would have considered that action to be one of an enemy disrespecting the gang. In answer to a hypothetical question reflecting facts from Thornton's killing, the expert testified that if an Eight-Trey member ventured into a Rollin' 60's hot spot area armed with a gun, and the Eight-Trey member was approached by an armed Rollin' 60's gang member, depending on the Eight-Trey member's purpose in entering Rollin' 60's territory, the gun would be used either for self-protection or to shoot a rival.

The expert was not aware of any situation in which a male member of Eight-Trey and a male member of the Rollin' 60's were friends. But he could not rule out the possibility of a Rollin' 60's associate "hanging around" with an Eight-Trey member if they were dating across gang lines. Still, the consequences of a Rollin' 60's associate bringing a male Eight-Trey member into Rollin' 60's territory could be "physical violence on up."

B.    *Procedural Background*

An information alleging charges against Bean and Williams was filed on February 8, 2018. At trial, on January 19, 2023, the People filed a second amended information. This pleading alleged as against Bean four counts of first degree murder (§ 187, subd. (a)) (counts 1 (Wilkerson), 4 (Pryor), 8 (Doxy), and 9 (Thornton)); three counts of being a felon in possession of a firearm (§ 29800, subd. (a)(1)) (counts 2, 6, & 10); and one count of assault with a firearm (§ 245, subd. (b)) (count 5, Sandra Pryor). As to all four

murder counts, multiple-murder special circumstances within the meaning of section 190.2, subdivision (a)(3) were alleged along with several aggravating factors (Cal. Rules of Court, rule 4.421).

As to the murder count 4 (Pryor), the second amended information alleged that Bean had personally used, intentionally discharged, and proximately caused death with a firearm (§ 12022.53, subds. (b)-(d)) and that the crime occurred during an attempted robbery or a burglary (§ 190.2, subd. (a)(17)(A) & (G)). As to the assault count 5 (Sandra Pryor), it was alleged that Bean had personally used a firearm (§ 12022.5, subds. (a), (d)). As to the murder count 8 (Doxy), it was alleged that the victim was a witness to a crime and intentionally killed because of that fact (§ 190.2, subd. (a)(10)). As to the murder count 9 (Thornton), it was alleged that Bean had personally used, intentionally discharged, and proximately caused death with a firearm (§ 12022.53, subds. (b)-(d)). Prior strike and prior serious and violent felony convictions were also alleged against Bean as to all counts (§§ 667, subd. (a)(1); 667.5, subd. (b); 1170.12).

Ultimately, Bean was acquitted of Wilkerson's murder (count 1). He was convicted of the remaining charges, except as to the Thornton murder (count 9), he was acquitted of first degree murder and the conviction was for the lesser murder in the second degree. The special circumstances and enhancement allegations were found true, and the People at trial abandoned proof of the aggravating factors after Bean had waived a jury trial as to these.[6] Bean admitted the prior convictions. He

---

6 With newly retained counsel, after the verdict, Bean moved for a new trial under section 1181 as to the three murder and the assault counts on the ground of insufficiency of the evidence, the same grounds urged on appeal by the same counsel, appointed on

ultimately received a sentence of three consecutive life terms without the possibility of parole for the three murders (counts 4, 8, 9), plus 25 years to life, consecutive, for assault with a firearm (count 5), plus an aggregate firearm enhancement of 51 years and four months to life, consecutive, plus an aggregate term of six years and eight months for the three gun possession counts (counts 2, 6, 10) calculated by the imposition of the midterm, and one-third the midterms, respectively, doubled for the prior strikes, consecutive. Additional punishment of 10 years for the two admitted prior strikes was imposed and stayed. The court also imposed a restitution fund fine and two fee assessments, along with victim restitution, imposed jointly and severally as against Bean and Williams.[7]

## III.   DISCUSSION

A.    *Issues on Appeal and Standard of Review*

Bean challenges each of his three murder convictions for insufficiency of the evidence. The convictions rested on the prosecution's pursuit of the following theories at trial against Bean: (1) first degree felony-murder for the shooting of Pryor during the course of an attempted robbery and/or burglary; (2) aiding and abetting Williams when she committed first degree

---

appeal, as to the murder counts. The People opposed the motion below and the trial court denied it at sentencing.

[7]    Williams was convicted of second degree murder in count 1 (Wilkerson); first degree felony- murder in count 4 (Pryor); and first degree murder in count 8 (Doxy), with true findings of firearm enhancements and special circumstances, as alleged. She was convicted of gun-possession charges in counts 3, 7, and 11. She was acquitted of murder in count 9 (Thornton).

25

malice-murder by the execution-style shooting of Doxy to eliminate her as a witness to the Pryor murder; and (3) malice-murder for the shooting and killing of Thornton without justification, found by the jury to be in the second degree.[8]

Bean admitted to shooting Pryor but said he did so only to enable Williams to free herself from her fight with Pryor and to leave the motel room after the failed drug-buy. He denied that the shooting was done during an attempted robbery or burglary, instead just a failed drug-buy. He also admitted to shooting Thornton but said he did so only in self-defense after Thornton had shot at him first. Thus, for both the Pryor and Thornton killings, there is no dispute that Bean was the actual shooter. As to Doxy's murder, Bean denied any culpability or involvement, including having provided Williams with the gun used to shoot Doxy, which Bean admittedly had just used to shoot Pryor less than 15 minutes before, or driving the getaway car to which the killer ran and entered immediately after shooting Doxy at close range in her Volvo. And, as noted, both Bean and Williams testified at trial. Thus, the jury's task included making factual determinations from the evidence based on credibility assessments.

To frame our analysis, when assessing the sufficiency of the evidence to support a judgment of conviction, we review the entire record " ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—

---

[8]    Bean's opening brief on appeal contains few record references and does not accurately or fully characterize the record evidence. Nor does the brief address the totality of the record evidence as framed by the applicable standard of review for insufficiency claims. He did not file a reply brief.

26

that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*); see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.) We ask " ' " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " ' [Citation.]" (*People v. Navarro* (2021) 12 Cal.5th 285, 302 *Navarro*), citing *Jackson v. Virginia, supra*, 443 U.S. at pp. 318–319.) "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (*Jackson v. Virginia, supra*, at p. 319.)

As part of this task of review for sufficiency of the evidence, we " 'presume the existence of every fact that the jury could reasonably have deduced from th[e] evidence.' [Citation.]" (*Navarro, supra,* 12 Cal.5th at p. 302.) And we " ' "accept logical inferences that the jury might have drawn from the circumstantial evidence." ' [Citation.] We do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable,' nor do we reconsider the weight to be given any particular item of evidence. [Citation.]" (*Ibid*.) " ' "To warrant the rejection of the statements given by a witness who has been believed by a trial court [or jury], there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions." ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 519.) The same standard applies when the conviction rests primarily on circumstantial evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; see also

27

*People v. Westerfield* (2019) 6 Cal.5th 632, 713.) We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's judgment. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We do not consider whether there is some evidence that could cause a trier of fact to reach a different conclusion or reweigh the evidence. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) The jury is not only " 'authorized to make any logical and reasonable deduction' " founded on the evidence, itis also " 'the exclusive judge of the weight and value of the inference that may be drawn by it … .' " (*People v. Mumin* (2023) 15 Cal.5th 176, 202.) " 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the … jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " (*Ibid.*; see also *People v. Penunuri* (2018) 5 Cal.5th 126, 142 [appellate courts look for substantial evidence and do not resolve credibility issues or evidentiary conflicts].)

That said, as the California Supreme Court recently reiterated, " ' "[e]vidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence, it merely raises a possibility, and this is not a sufficient basis for an inference of fact." [Citation.] The substantial evidence rule mandates consideration of the weight of the evidence before deferring to the conclusions drawn from the evidence by the trier of fact. "[I]n determining whether the record is sufficient . . . the appellate court can give credit only to 'substantial['] evidence, i.e., evidence that reasonably inspires confidence and is 'of solid value.' " ' [Citation.]" (*People v. Collins* (2025) 17 Cal.5th 293, 307.) "A jury must avoid ' " 'unreasonable

inferences and not … resort to imagination or suspicion.' [Citation.]" [Citation.] "Mere conjecture, surmise, or suspicion is not the equivalent of reasonable inference and does not constitute proof." ' [Citation.]" (*Ibid.*)

B.    *Relevant Law of Murder*

As noted, the convictions Bean challenges for insufficiency of evidence involved the prosecution's theories of felony murder (Pryor), aiding and abetting first degree malice murder (Doxy), and second degree malice murder (Thornton).

Malice murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) First degree malice murder includes the additional elements of premeditation and deliberation. (*People v. Knoller* (2007) 41 Cal.4th 139, 151; § 189 [degrees of murder].)

For purposes of murder, malice may be either express or implied. (§ 188, subd. (a).) It is express when there is manifested a deliberate intent to unlawfully take the life of another. (§ 188, subd. (a)(1); *People v. Gonzales* (2012) 54 Cal.4th 643, 653 (*Gonzales*).) It is "implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2); *People v. Gentile* (2020) 10 Cal.5th 830, 844 (*Gentile*), abrogated by statute on another ground as stated in *People v. Hin* (2025) 17 Cal.5th 401, 442.) Said another way, implied malice is shown "when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person acts with conscious disregard for the danger to life that the act poses." (*Gonzales, supra*, at p. 653; *People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 500 [same].)

29

Express malice requires an intent to kill but implied malice does not. (*People v. Soto* (2018) 4 Cal.5th 968, 976.)

Felony murder involves a killing committed in the perpetration of enumerated felonies, including attempted robbery and burglary, and constitutes murder in the first degree. (§ 189, subd. (a).) Section 189, subdivision (e) now provides that a felony murder participant is liable for murder only if the person was the actual killer or, if not, the person either "with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree" or the "person was a major participant in the underlying felony and acted with reckless indifference to human life" (as described in § 190.2, subd. (d)). (§ 189, subd. (e)(1)(3).) The perpetrator must have the specific intent to commit the underlying felony and the killing must not be merely incidental to that felony. (*People v. Proctor* (1992) 4 Cal.4th 499, 532.)

Someone who aids and abets the commission of a crime is culpable as a principal in that crime. (§ 31; *Gentile, supra*, 10 Cal.5th at p. 843.) Aiding and abetting is not a separate crime but a form of derivative liability for the underlying crime. (*People v. Francisco* (1994) 22 Cal.App.4th 1180, 1190; accord *Gentile, supra*, 10 Cal.5th at p. 843.) As applicable to murder, "under direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends." (*Gentile, supra*, 10 Cal.5th at p. 843, quoting *People v. Perez* (2005) 35 Cal.4th 1219, 1225 (*Perez*).) "Guilt as an aider and abettor is guilt 'based on a combination of

the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.' " (*People v. Powell* (2021) 63 Cal.App.5th 689, 710 (*Powell*).) Generally, "proof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's means rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus— conduct by the aider and abettor that in fact assists the achievement of the crime." (*Perez, supra*, 35 Cal.4th at p. 1225.) For a person not the actual killer, aiding and abetting an *express* malice murder means that the aider shares the perpetrator's mental state of express intent to kill. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).) Aiding and abetting an *implied* malice murder requires that the aider intentionally, by words or conduct, aid the perpetrator in a life-endangering act—not necessarily the crime. And the aider must personally have (1) knowledge that the perpetrator intended to commit the act, (2) intent to aid the perpetrator in the commission of the act, and (3) knowledge that the act naturally and probably will cause death, but the aider nonetheless acts in conscious disregard of this probable result. (*Powell, supra*, 63 Cal.App.5th at p. 713.)

In addition to proving the elements of murder, "when provocation or imperfect self-defense are at issue, the prosecution is compelled to disprove those circumstances beyond a reasonable doubt." (*People v. Schuller* (2023) 15 Cal.5th 237, 254.)

31

C.      *Analysis*

      1.      <u>Sufficient Evidence of Felony Murder of Pryor (Ct.2)</u>

Bean contends, erroneously, there is no record evidence that the killing occurred during a robbery or burglary or attempt of either. He does not grapple with the evidence that supports the judgment in this regard. He argues the record evidence supports only that no robbery or attempt or theft occurred because, contrary to or disregarding the evidence, no counterfeit money was shown to have been presented by Williams for the drug-buy. He further asserts he entered the motel room only after Pryor "became enraged and began a physical fight" with Williams, and that his only intent in shooting into the room was "to protect" her. As Bean does not address or confront the record evidence— direct and circumstantial, and reasonable inferences therefrom— supporting the conviction, he fails to meet his burden on appeal and we reject his insufficiency claim on count 2.

The prosecution's theory of the Pryor murder was that Bean and Williams planned to take Pryor's cocaine and money after using Doxy—a friend of Pryor's—to set up the ruse that Bean and Williams simply came to purchase cocaine. As observed by the People as respondent here, in discussing the jury instructions, the prosecution told the court that "there was both the intent to do a robbery or the intent to commit this theft by [false] pretense." The jury was instructed that Bean could be convicted of felony murder if he committed attempted robbery or burglary, intended to commit attempted robbery or burglary, and while doing so, caused the death of another person. The jury was also instructed on the elements of attempt, robbery, and burglary with the underlying felony of theft by false pretenses, and that the jury need not be unanimous as to which theory. In closing

argument, the prosecutor told the jury that "Pryor was the victim of an attempted robbery that went bad" after Bean and Williams "set him up" by using Doxy as "someone that he knew" to gain access to the room. And that "Pryor made the critical mistake of fighting back, and when he [did so] and just tried to protect himself and his wife, he was repeatedly shot and left for dead on a motel room floor."

As we have noted, attempted robbery or burglary will support a first degree felony murder conviction under section 189. (*People v. Farley* (2009) 46 Cal.4th 1053, 1118–1119 [killing perpetrated in the commission or attempt to commit any of the enumerated felonies will support first degree felony murder conviction].) As the jury was instructed, robbery is the "felonious taking of personal property in the possession of another, from [their] person or immediate presence, and against [their] will, accomplished by means of force or fear." (§ 211.) Attempt "consists of two elements: a specific intent to commit the crime, and a direct but ineffectual act done towards its commission." (§ 21a.) Burglary is defined under section 459 as when the defendant "enters any [defined structure] with intent to commit grand or petty larceny or any felony." Section 189 does not limit the definition of burglary or exclude any kind of burglary. "An intent to commit theft by a false pretense or a false promise without the intent to perform will support a burglary conviction." (*People v. Parson* (2008) 44 Cal.4th 332, 354; see § 484, subd. (a) [definition of "theft" as including the taking of money or property by false or fraudulent representation or pretense].) Accordingly, the same will support a felony-murder conviction with burglary as the underlying felonious offense.

33

The prosecution's theories underlying Bean's felony-murder conviction in count 2 for Pryor's killing, whether attempted robbery or burglary as the underlying felony, are fully supported by substantial evidence appearing in the whole record—evidence that Bean ignores. There is no dispute that Bean was the actual killer. (See § 189, subds. (a) & (e)(1) [actual killer during perpetration of enumerated felonies liable under law of felony murder].)

The surveillance video, which we have reviewed, shows Bean, Williams, and Doxy entering the motel together; Williams and Doxy going to the Pryors' door on the second floor with Bean hanging back down the hall; Bean pacing around the second floor balcony while Williams and Doxy gain entry into the Pryors' room; Doxy entering and leaving the room shortly thereafter with Williams remaining and the door open; Doxy briefly speaking to Bean on her way out; Bean approaching the open door and pushing on it to open it further and gain entry while someone is pushing back from the interior of the room; bursts of dust or debris in the camera view likely from the force of Bean's gun firing through the door; the door closing and Bean going to the room's side window and breaking it before firing more shots into the room from that location; Williams—without the jacket she had entered with—then slowly exiting the room and she and Bean running away, going down the stairs and out to leave the motel.

Viewed in the light most favorable to the judgment, the video evidences a plan or set-up to rob or steal from Pryor or leads to reasonable inferences to that effect. The admitted photos of the room after the shooting show Pryor's body face down on the ground and money bills, some bloody, near him. More bills are

34

shown in Sandra Pryor's open purse. Some of the bills clearly bear the label "For Motion Picture Use Only," indicating their counterfeit character. Williams herself admitted to having the fake bills and testified she had given one of them—a $50—to Pryor to purchase cocaine and got a $20 bill in change back from him. Counterfeit bills were found in her jacket left behind.

Sandra Pryor testified that after the knock on the hotel room door, the voice outside the door said it was "Tiffany." She relayed how Doxy and Williams were in the room and Doxy soon left. Bean then showed up at the door with a gun and said, "You know what this is. Give me your money. I want everything."

Sandra Pryor explained how Williams then pinned her against the wall behind the door and threatened her to not resist by saying, "Don't try it. Don't move. Don't say nothing." While against the wall and through the crack in the door, Sandra Pryor could see Bean pushing the door open and she heard a gunshot. She explained how she and Pryor pushed against the door trying to keep Bean out, finally closing it. She testified that Pryor and Williams began to fight inside the room after Bean had come to the door with the gun and how Williams at one point said, "Tiffany set this up. It was Tiffany," which reflects an advance plan among Williams, Bean, and Doxy to set up the drug-buy as a ruse to rob or steal from Pryor. Sandra Pryor explained how she had retreated to the separate kitchen area of the room to call 911 after Bean had shot through the door and while Williams and Shawn Pryor were struggling inside the room. Then she heard breaking glass and more gunshots, and saw Pryor falling to the floor, bleeding. She tried to aid him but was unsuccessful. Bean's DNA was found on the broken window sill and he admitted to having shot the gun. There was no evidence, other than Bean's

own testimony, that Pryor had a gun and had shot first or that Williams was in imminent danger inside the room when Bean delivered the first shot through the motel-room door and the additional shots through the broken window.[9] Bean's and Williams's slow run from the room and their flight from the motel after the shooting, as well as their immediate targeting of Doxy as a witness to the attempted robbery or burglary gone bad, are further substantial evidence of Bean's guilt for the felony murder of Pryor.

All the physical evidence was consistent with Sandra Pryor's testimony, which the jury was entitled to credit over that of Bean and Williams. The jury was entitled to conclude from all the evidence that Bean either attempted to rob Pryor or that he and Williams entered the motel room, having set up Pryor by using Doxy to gain access to the room, with the intent to commit theft by false pretenses by use of the counterfeit bills. (See *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1245 [as intent is rarely susceptible of direct proof, it may be inferred from all the facts and circumstances; where such facts and circumstances reasonably indicate a defendant's purpose in entering a premises is to commit larceny or any other felony, a burglary conviction will stand].)

---

[9] Even if the jury had found it credible that Pryor had had a gun and shot first in response to the attempt to rob him, as pointed out by respondent, neither perfect nor imperfect self-defense may be "invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations]" (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.)

In our view, there is overwhelming substantial evidence in the record to support Bean's felony murder conviction in count 2 and that evidence does not amount to mere conjecture or speculation. On top of that, Bean's opening brief does not address the evidence that supports this conviction and thus fails to meet his burden on appeal.

    2.    <u>Sufficient Evidence of Aiding and Abetting First Degree Murder of Doxy (Ct.4)</u>

Bean frames the sufficiency challenge to his conviction for the first degree malice murder of Doxy by aiding and abetting by acknowledging that the evidence pointed to Williams as the shooter, and that his guilt for the crime could only come through the theories of aiding and abetting or conspiracy.[10] He contends the only evidence supporting this conviction is that he had previously possessed the gun—less than 15 minutes before—and was nearby when the execution-style shooting occurred. He argues the record lacks evidence of how Williams obtained the gun from him or why he would have allowed her to have it, and that even if his car had been nearby, his mere presence near the scene of a crime is insufficient to prove he aided and abetted the

---

[10]    Williams was convicted of first degree malice murder of Doxy with findings that she personally used, intentionally discharged, and proximately caused death with a firearm and that the murder was committed for the purpose of eliminating a witness. While Bean addresses an alternative conspiracy theory in his argument, that is not a theory the People pursued at trial, the jury was not instructed on it, and respondent does not address it in its brief. Nor do we as we conclude substantial evidence supports the conviction on the theory of aiding and abetting, the one actually pursued at trial and on which the jury was instructed.

murder. This is not a full or fair reading of the substantial record evidence supporting the conviction.

The prosecution's theory of murder against Bean for Doxy's killing was indeed by aiding and abetting. The evidence, both direct and circumstantial, supported reasonable inferences that the mutual decision or plan by Bean and Williams to kill Doxy was reached within minutes of the Pryor killing as they left the motel, because the Doxy killing occurred less than 15 minutes later and less than three miles away. Williams rode in Doxy's car as a passenger when she and Doxy left the motel where the Pryor murder had occurred and drove to a small parking lot, their arrival there shown on surveillance video taken from a nearby business.

Circumstantial evidence and reasonable inferences support that Williams already had the gun in her possession while in Doxy's car after leaving the motel and that Bean had just handed it to her because he had used it to kill Pryor only minutes before and they were together when that happened. As shown on video, Doxy stopped her Volvo in the parking lot, backing into a space at an angle. As further shown, a car resembling Bean's Malibu was traveling in tandem with the Volvo when it approached the parking lot but that car didn't turn in. Instead, that car turned the other direction, stopped in the street, and waited for Williams to shoot Doxy and run to that car after its headlights flashed, after which the car drove away. Reasonable inferences from the evidence support that the other car was Bean's; he was driving it; he had given the gun to Williams right after shooting Pryor at the motel so Doxy could be eliminated as a witness, as she knew Doxy would be shown on the motel's surveillance video and then identified and found by police; he and Williams coordinated this

38

plan, at the latest, just after Pryor was shot and Bean waited for Williams in his car near the parking lot while she shot Doxy execution style in the Volvo; and then he and Williams drove away.

Both Bean and Williams testified they went to his friend Doughboy's house together after the Pryor killing, omitting the Doxy murder in between. There was no other apparent purpose for them to stop on the way to that destination, other than to eliminate Doxy. Bean could not explain how the same gun that had killed Pryor also killed Doxy. And the jury was entitled to reject Williams's testimony that Doxy separately drove herself to Doughboy's house, that Doughboy drove Bean's car away from his house with Bean's gun in the console, that Doxy left Doughboy's house in her own car and never came back, and that Doughboy or some other third party must have used Bean's gun to kill her.

The facts and reasonable inferences easily support Bean's conviction for first degree malice murder of Doxy by aiding and abetting. They establish that Bean aided Williams's commission of Doxy's murder with knowledge of Williams's unlawful intent and with his own intent to assist her in achieving those unlawful ends. (*Gentile, supra*, 10 Cal.5th at p. 843.) Williams shot Doxy, as shown on video, in the face at close range—the direct perpetrator's actus reus. Bean had given Williams the gun to use in the crime, as he had just used it to kill Pryor less than 15 minutes before, and he did so before they left the motel where Pryor had just been killed. Bean knew that Doxy was either part of or a witness to the plan to set up Pryor at the motel room. Bean stopped his car outside the parking lot where Doxy turned in and stopped her own car, and he waited for Williams to shoot Doxy so he could enable Williams's flight from the scene. These

facts support Bean's own actus reus—multiple acts—that assisted Williams's achievement of the crime. They also support the reasonable inference of Bean's knowledge of Williams's unlawful intent and his own intent to assist her in achieving her unlawful ends—his own mens rea. (See *People v. Thomas* (2011) 52 Cal.4th 336, 355 [intent may be proven circumstantially]; *People v. Garcia* (2008) 168 Cal.App.4th 261, 274 [defendant's presence at crime scene, failure to take steps to prevent the commission of the crime, companionship, flight, and other conduct before and after the crime are relevant factors in determining liability for aiding and abetting].)

As for malice, Bean either shared Williams's express intent to kill Doxy or, at a minimum, he intentionally aided Williams by his own conduct in a life-endangering act, with knowledge that Williams intended to eliminate Doxy and his own intent to aid in that act with knowledge that the act would naturally and probably cause her death and in conscious disregard of this probable result. (*Perez, supra*, 35 Cal.4th at p. 1225; *McCoy, supra*, 25 Cal.4th at p. 1117; *Powell, supra*, 63 Cal.App.5th at p. 710, 713.)

We accordingly reject Bean's insufficiency claim as to his conviction for Doxy's murder in count 4, finding the conviction fully supported by substantial evidence in the record.

      3.      <u>Sufficient Evidence of the Second Degree Murder of Thornton Without Justification (Ct.9)</u>

Bean contends there is insufficient evidence to support his conviction for the second degree murder of Thornton, because, as Bean testified, he acted only in self-defense when he admittedly shot Thornton. But as with Bean's other insufficiency claims, he does not address the record evidence supporting the conviction, in

particular that this admitted shooting was without legal justification.

The undisputed evidence showed Bean was sitting in the passenger seat of his parked car, Williams having driven it to a location within Rollin' 60's claimed territory. Bean, an Eight-Trey gang member, was armed with the same .45 caliber gun connected to the three prior killings. Thornton approached the car on foot and tapped on the windshield with an object in his hand, and said to Bean, "What are you doing around here?" and "You better get out of here, motherfucker." Jose N. saw Thornton carrying two things in his hands that looked like a gun and a cell phone, and Thornton's tapping on Bean's windshield was likely with the gun, which was "probably a nine" millimeter. Shots followed, Bean and Thornton each firing their respective guns, as bullets and spent casings at the scene later showed. Thornton was hit. This much, Bean acknowledges. But he testified that Thornton shot first and that Bean only returned fire in self-defense. His argument ignores the substantial evidence supporting the conviction for second degree murder without justification.

As Jose N. testified, after Thornton tapped Bean's windshield with an object in his hand, he pointed the object downward toward the ground. Thornton then put both hands in front of his body, turned away from Bean's Malibu, and continued to walk away—a retreat before any shots were fired. Jose N. then heard a volley of gunshots, and Williams said to him, "I've gotta go." There were a lot of gunshots, with one series louder than the other, the louder one coming first. Jose N. later saw a cell phone and a handgun near Thornton's body on the ground after the shooting, but someone in the gathered crowd removed these

41

items before law enforcement arrived on scene. Add to this that Bean immediately fled from the scene and that he and Williams later tried to hide the gun used in all four killings, both facts reflecting Bean's consciousness of guilt. (*People v. Jones* (2018) 26 Cal.App.5th 420, 441 [evidence of consciousness of guilt admissible to prove the crime]; *People v. Dabb* (1948) 32 Cal.2d 491, 500 [consciousness of guilt inferred from attempt to avoid apprehension]; *People v. Yeoman* (2003) 31 Cal.4th 93, 131 [suppression of evidence showed consciousness of guilt]; *People v. Holloway* (2004) 33 Cal.4th 96, 142 [same].)

The volley of gunshots in the exchange hit nearby parked cars, including Jose N.'s. Two bullets were recovered from his car along with a casing from nearby grass. Detectives also found eight .45 caliber casings and five or six fired .45 caliber bullets and bullet fragments at the scene, along with multiple nine-millimeter casings, from the gun Thornton had carried. The .45 caliber casings matched those recovered from the Wilkerson crime scene. A .45 caliber gun is louder when shot than a less powerful gun shooting nine-millimeter bullets.

From the firearms evidence and Jose N.'s direct testimony about the loudness of the first shots fired, the jury could reasonably have inferred that Bean shot first. Add to this Jose N.'s testimony that the object in Thornton's hand was pointing downward with both his hands in front of him and he was turning around and walking away when the first shots were fired. The jury was entitled to conclude from all this evidence that Bean having shot at Thornton first while Thornton was retreating and not a threat, Bean acted unjustifiably, despite Thornton's earlier aggressive words and his tapping on Bean's windshield, as Bean was not in imminent peril when he shot.

(See § 197 [enumerated circumstances of justifiable homicide].) The jury was also entitled to disbelieve Bean's contrary version of events, including that he subjectively believed he was under threat of death or great bodily injury when he fired. (*People v. Morales* (2021) 69 Cal.App.5th 978, 989 [jury is free to disbelieve defendant's claim of acting in self-defense, especially in light of evidence to the contrary].) And the jury could also have taken into account the evidence of Bean's consciousness of guilt.

In short, the evidence was in conflict as to whether Bean acted in self-defense when he shot Thornton, with substantial evidence supporting the jury's verdict that he did not. " ' "[W]here the evidence is uncontroverted and establishes all of the elements for a finding of self-defense it may be held as a matter of law that the killing was justified; however, where some of the evidence tends to show a situation in which a killing may not be justified then the issue is a question of fact for the jury to determine." ' [Citation.]" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1044.) The jury here resolved this conflict adversely to Bean, and substantial evidence, viewed in the light most favorable to the judgment, supports this conclusion. Bean has thus failed to show insufficiency of the evidence to support the conviction.

D.    *Unauthorized Sentence re Imposed but Stayed Five-Year Prior Enhancements*

The second amended information, filed at trial on January 19, 2023, as to Bean, alleged two prior serious felony convictions under section 667, subdivision (a)(1) in connection with the four murder counts 1, 4, 8, and 9 and the assault count 5. It also alleged two prior prison terms under what appears to have been former section 667.5, subdivision (b) in connection with the same counts, plus the firearm-possession counts 2, 6, and 10. These

43

latter were later deleted from the information by handwritten interlineation. Bean admitted the two priors. He was ultimately convicted here of counts 2, 4, 5, 6, 8, 9, and 10.

At sentencing, the trial court did not initially address the section 667, subdivision (a)(1) priors. The court then recalled the matter and said, "The court failed to address that the defendant had two five-year priors. The court is going to exercise its discretion, impose the 10 years, and then stay them, so there would be no extra time." The court did not reference a particular statute or a particular count when doing so.[11] The minute order from sentencing, in reference to this, states: "The court imposes the 10 years pursuant to Penal Code section 667.5(A) as the defendant admitted the prior convictions. . . . The imposition of sentence is stayed pursuant to Penal Code section 654." The abstract of judgment, without reference to a particular count, likewise indicates unspecified punishment for an enhancement under section 667.5, subdivision (a), imposed but stayed.

It appears the minute order and abstract of judgment contain a clerical error in that they indicate the imposition but staying of an aggregate 10-year enhancement term under section 667.5, subdivision (a), instead of what appears to have been intended by the court to be under section 667, subdivision (a)(1). But such a sentence, even as intended, is unauthorized.

_____

[11] The People had requested in their sentencing memorandum the imposition of 10 years, consecutive, for the two section 667, subdivision (a)(1) priors, as attached to the assault count 5 and the second degree murder count 9, citing "*People v. Williams* (2004) 34 Cal.4th 397, 405 ['[U]nder the three Strikes law, section 667(a) enhancements are to be applied individually to each count of a third strike.'].)"

44

The legislative enactment of Senate Bill No. 1393 (2017-2018 Reg. Sess.), effective January 1, 2019, amended sections 667, subdivision (a) and 1385 to provide trial court discretion to strike enhancements for felony convictions. (Stats. 2018, ch. 1013, § 1.) There is no statutory authorization for the trial court to impose but stay rather than strike an enhancement, "not, at least, when the only basis for doing either is its own discretionary sense of justice," as it appears here. (*People v. Lopez* (2004) 119 Cal.App.4th 355, 364.) Rule 4.447 of the California Rules of Court provides authority for imposing but staying an enhancement, but this rule applies only "when 'an enhancement that *otherwise* would have to be either imposed or stricken is barred by an overriding statutory prohibition,' " a circumstance not present here. (*People v. Bay* (2019) 40 Cal.App.5th 126, 139.)

Although Bean did not object to the trial court imposing but staying the two five-year prior enhancements, this aspect of the sentence is unauthorized and is reviewable on appeal in the absence of an objection below.[12] (*See In re Sheena K.* (2007) 40 Cal.4th 875, 886–889.) It is clear from the court's entire sentence and its comments when addressing these prior enhancements that the court intended not to impose additional punishment for them. We will therefore strike the 10 years imposed but stayed for the two five-year prior enhancements under what the court appears to have intended as section 667, subdivision (a)(1). (See *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 [remand not required if record clearly indicates trial court would have

---

[12] We note that co-defendant Williams raises this issue as error in the companion appeal. There, the People concede the error.

exercised discretion and reached the same conclusion]; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 [remand to trial court not required when it would be an idle act].)

## IV. DISPOSITION

The clerk of the trial court on remand is directed to correct the sentencing minute order and the abstract of judgment to strike what is indicated as the aggregate 10-year enhancement imposed but stayed under section "667.5(A)." The judgment of conviction is otherwise affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

WILLIAMS, J.[*]

We concur:

HOFFSTADT, P. J.

MOOR J.

---

[*] Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.